IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA BETH PICOZZI, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 4:08-CV-0926 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| C.O. HAULDERMAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM**

March 3, 2011

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Plaintiff Linda Beth Picozzi ("Plaintiff" or "Picozzi"), an inmate incarcerated at the Muncy State Correctional Institution ("SCI-Muncy") in Muncy, Pennsylvania, initiated this *pro se* civil rights action by filing a Complaint pursuant to the provisions of 42 U.S.C. § 1983.

Presently before the Court is an unopposed Motion for Summary Judgment filed on behalf of the remaining Defendants to this action. (Doc. 53.) For the reasons set forth herein, the Motion will be granted.

**I.  PROCEDURAL BACKGROUND**

In her Complaint, filed on May 13, 2008, Picozzi raises claims of excessive force and deliberate indifference to a serious medical need arising from an incident at

SCI Muncy on May 12, 2006 during which she was extracted from her cell to be taken to the Mental Health Unit ("MHU"). The Complaint names the following Defendants, who were employed at SCI Muncy at the relevant time: Corrections Psychological Services Specialist Gregory C. Thompson; Lieutenant Teresa Sohnleitner; Sergeant Lonzo E. Burnside; Corrections Officer Gary P. Adams; Sergeant Cheryl A. Flick; Corrections Officer Tammie J. Howell; Corrections Officer Karen E. Mowery; Corrections Officer Karen Kemp; and Corrections Officer Scott M. Haldeman ("Corrections Defendants").

Dr. Andrew Fabian and Dr. Keith Tolan also were named as Defendants, but the Eighth Amendment claims against them alleging inadequate medical care for injuries resulting from the May 12, 2006 incident have been dismissed. As to Dr. Fabian, on July 29, 2008, a Motion to Dismiss the Complaint was filed on his behalf. (Doc. 19.) By Memorandum and Order dated February 5, 2009, Dr. Fabian's Motion was granted. (Doc. 30.) Although the Motion was granted without prejudice to Picozzi's ability to file amendment to her Complaint to attempt to state a claim against Fabian within thirty (30) days, the docket reflects that Picozzi never filed an amendment to her claim against Fabian.

As to Dr. Tolan, a waiver of service was not returned as to Defendant Dr. Tolan

following service of the Complaint on all Defendants on May 16, 2008. Although Picozzi was given the opportunity pursuant to this Court's February 5, 2009 Order to provide the correct address for Dr. Tolan (*see* Doc. 29), and she provided an address at Danville State Hospital, upon reissuance of the summons, the request for waiver of service that had been issued was returned unexecuted indicating that Tolan no longer was present at that address. (*See* Doc. 33.) Picozzi was given additional time to provide a current address for Tolan, but never did so. Accordingly, by Order dated October 16, 2009, her claims against Tolan were dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). (*See* Doc. 46.)

Corrections Defendants filed an Answer to the Complaint on July 18, 2008. (Doc. 12.) By Order dated October 16, 2009, the Court directed the completion of discovery within sixty (60) days and the filing of dispositive motions within forty-five (45) days from the close of discovery. (Doc. 45.) Following a request for an extension of time to file a dispositive motion, which was granted, on March 1, 2010, the instant Motion for Summary Judgment was filed on behalf of Corrections Defendants. (Doc. 53.) On March 8, 2010, Defendants filed a Statement of Material Undisputed Facts (Doc. 55), supporting Declarations (Docs. 55-2 through 55-10), and a supporting brief (Doc. 56). Picozzi failed to file any opposition to the instant

3

Motion, and therefore, by Order dated April 9, 2010, she was directed to file her opposition, including an opposing brief as required by Middle District of Pennsylvania Local Rule ("LR") 7.6, and a statement of material facts as required by LR 56.1, to the Motion on or before April 23, 2010. (Doc. 58.) Picozzi was warned that her failure either to file her opposition or a proper motion for an extension of time within the required time would result in Defendants' Motion being deemed unopposed. (*See id.*) The deadline for Picozzi to file her opposition has long expired, and she has failed to oppose the instant Motion.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[1] Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party

---

[1] We note that an amendment to the text of Fed. R. Civ. P. 56 became effective on December 1, 2010. The amendment did not result in a change to the standard (i.e. the word "issue" within subsection (c) has been changed to "dispute"). Even so, we quote the language of the version of the Rule that was in effect at the time Defendants moved for summary judgment as it is appropriate to dispose of the motion under that version. *See Fairclough v. Wawa, Inc.,* 2010 WL 5209327, at *3 n.3 (3d Cir. Dec. 23, 2010).

will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Picozzi failed to submit any opposition to Defendants' Motion for Summary

Judgment, and therefore, the Motion is deemed unopposed. Moreover, because Picozzi has failed to file a separate statement of material facts controverting the statement filed by Defendants, all material facts set forth in Defendants' Statement of Undisputed Material Facts (Doc. 55) will be deemed admitted. *See* M.D. Pa. LR 56.1.[2] Even though Picozzi has not opposed the Motion, the Court still must determine whether Defendants are entitled to summary judgment as a matter of law. *See Lorenzo v. Griffith*, 12 F.3d 23, 38 (3d Cir. 1993); *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 174-75 (3d Cir. 1990).

**III. DISCUSSION**

    **A. Undisputed Facts**

Defendants' Statement of Undisputed Facts (Doc. 55) and supporting materials[3] establish the following undisputed facts relevant to the disposition of the instant Motion:

    On May 12, 2006, at approximately 8:30 a.m., SCI Muncy Psychological

---

[2] LR 56.1 provides, in relevant part, as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

[3] In support of the instant Motion, Defendants submitted the Declarations of Defendant Thompson (Doc. 55-2); Defendant Sohnleitner (Doc. 55-3); Defendant Burnside (Doc. 55-4); Defendant Adams (Doc. 55-5); Defendant Flick (Doc. 55-6); Defendant Howell (Doc. 55-7); Defendant Mowery (Doc. 55-8); Defendant Kemp (Doc. 55-9); and Defendant Haldeman (Doc. 55-10).

6

Services Specialist Gregory Thompson observed inmate Linda Picozzi kicking her Restricted Housing Unit ("RHU") cell door extremely hard with the heels of her feet. (Doc. 55-2, Thompson Decl., ¶ 3.) Thompson asked Picozzi why she was acting in this manner, but she refused to speak. (*Id.* ¶ 4.) Picozzi showed Thompson a note saying she was trying to bring attention to herself becasue she was being abused. (*Id.* ¶ 5.)

Thompson reported Picozzi's behavior to Brian Shiptowski, a Psychiatric Nurse Practitioner, and he ordered that Picozzi be moved to a Psychiatric Observation Cell ("POC"). (*Id.* ¶ 6.)

Picozzi refused to cooperate with the move to a POC. (*Id.* ¶ 7.) For approximately the next two (2) hours, staff made numerous attempts to speak with Picozzi in an attempt to persuade her to move and comply with orders; however, she refused to comply. (*Id.* ¶ 8.)

At approximately 10:30 a.m., Mr. Shiptowski was informed that Picozzi had refused to comply with orders and that Oleoresin Capsicum ("OC") pepper spray may be used to gain her compliance. (*Id.* ¶ 9.)

Picozzi refused all direct orders to voluntarily transfer from her RHU cell to the POC. (Doc. 55-3, Sohnleitner Decl., ¶ 4.) Consequently, it was determined that a compliance team would be formed to involuntarily transfer her. (*Id.*) The team consisted of corrections officer and a nurse. (*Id.*)

When the compliance team entered the RHU and arrived at Picozzi's cell, Lieutenant Sohnleitner gave Picozzi repeated direct orders to come to the front of her cell in order to be handcuffed for the transfer. (*Id.* ¶ 5.) However, Picozzi refused to comply with the orders. (*Id.*) Sohnleitner then authorized a corrections officer to use OC spray to attempt to gain compliance. (*Id.*) The OC spray was applied, but because Picozzi had placed a towel over her face, it appeared to have no effect. (*Id.*) After several minutes, Sohnleitner authorized a second spray, which was done. (Doc. 55-3, Sohnleitner Decl., ¶ 5.) Again, the OC spray had no effect. (*Id.*)

Shortly after this, Major Clark entered the RHU and attempted to talk to Picozzi to get her to voluntarily comply with the transfer. (*Id.* ¶ 6.) After about thirty (30) minutes of such efforts, Picozzi still would not comply. (*Id.*) She refused to come to her cell door so that handcuffs could be placed on her for the transfer. (*Id.*)

Following these efforts, it was determined by medical staff that an emergency 302 involuntary commitment order under Pennsylvania law would be obtained so that Piczozi could be transferred to the institution's MHU. (*Id.* ¶ 7.)

After the 302 order was obtained, a cell extraction team was assembled and briefed. (Doc. 55-3, Sohnleitner Decl., ¶ 8.) The team consisted of Defendants Adams, Mowery, Kemp, Flick, Howell, and Burnside. (*Id.*) In addition, Licensed Practical Nurse ("LPN") Beiler was on scene to provide any needed medical assistance.

8

(*Id.*)

The team entered the RHU and Lieutenant Sohnleitner gave Picozzi one final opportunity to voluntarily comply with the transfer. (*Id.* ¶ 9.) She refused, and so the team entered her cell. (*Id.*) Picozzi physically resisted the officers' efforts to bring her under control. (*Id.* ¶ 10; Doc. 55-5, Adams Decl., ¶¶ 6-8.) Adams was the first officer to enter, and repeatedly directed Picozzi to get down on her bed, but she did not comply. (Doc. 55-5, Adams Decl., ¶ 6.) Adams therefore used the Electric Body Immobilizer Device ("EBID") shield to apply a shock to her body so as to enable the officers to handcuff her and remove her from the cell. (*Id.* ¶ 7.) Picozzi continued to refuse to comply with direct orders to get down and was physically resisting the officers' efforts to bring her into control by using her arms to push them away from her. (*Id.* ¶ 8; Doc. 55-3, Sohnleitner Decl., ¶ 11.)

The EBID shield appeared to have no effect on Picozzi. (Doc. 55-3, Sohnleitner Decl., 12; Doc. 55-5, Adams Decl., 9.) As a result, the officers physically restrained her with a minimum amount of physical force while handcuffs and leg shackles were applied to her and she was removed from the cell. (Doc. 55-3, Sohnleitner Decl., 12; Doc. 55-5, Adams Decl., 9.)

After Picozzi was removed from the cell, she was placed into a transportation cart for the transfer from the RHU to the MHU. (Doc. 55-3, Sohnleitner Decl., ¶ 13.)

9

When the team arrived at the MHU, Picozzi was removed from the cart, placed in MHU cell #11, and her clothing was removed so an MHU smock could be placed on her. (*Id.* ¶ 14.) The leg shackles and handcuffs then were removed, and Nurse Beiler checked Picozzi. (*Id.*)

Defendant Flick's involvement was limited to holding Picozzi's legs while shackles were applied to her legs. (Doc. 55-6, Flick Decl., ¶ 5.)

Defendant Howell's involvement was limited to applying the leg shackles to Picozzi's legs and restraining her in the MHU cell while her clothing and shackles were removed. (Doc. 55-7, Howell Decl., ¶ 6.)

Defendant Mowery's involvement was limited to holding Picozzi's left arm while handcuffs were applied to her and assisting in removing the handcuffs once she was taken to the MHU. (Doc. 55-8, Mowery Decl., ¶ 3.)

Defendant Kemp's involvement was limited to handcuffing Picozzi, removing her clothing in the MHU cell, and removing her shackles and handcuffs. (Doc. 55-9, Kemp Decl.) It is standard procedure to strip search an inmate being placed in a POC in order to ensure the safety of the inmate and staff. (*Id.* ¶ 7.) Picozzi refused to be strip searched; consequently, Kemp had to cut off her clothes. (*Id.* ¶ 8.)

Defendant Burnside's involvement was limited to operating a video camera to

record the transfer of Picozzi.[4] (Doc. 55-4, Burnside Decl., ¶ 2.) At no time did he place his hands on Picozzi or otherwise participate in her removal from the RHU to the MHU. (*Id.* ¶ 3.)

Defendant Haldeman[5] has declared under penalty of perjury that he neither participated in nor observed the cell removal and transfer of Picozzi, and therefore had no involvement whatsoever with her removal from her cell on May 12, 2006. (Doc. 55-10, Haldeman Decl.)

### B. Analysis

Picozzi's Complaint alleges that Corrections Defendants used excessive force while removing her from her cell at SCI Muncy in order to transfer her to a POC on May 12, 2006. Corrections Defendants argue that the undisputed facts establish that Picozzi's right to freedom from cruel and unusual punishment under the Eighth Amendment was not violated when she was moved from the RHU to the MHU, and that they are therefore entitled to judgment as a matter of law. (*See* Doc. 56, Dfts.

---

[4] Although Picozzi identified Burnside as a Defendant in her Complaint, she also identified a John Doe Correctional Officer who "video taped the event that [took] place on 5-12-06." (*See* Doc. 1 at 2 11-12.) Picozzi has not submitted any evidence either to controvert Burnside's declaration that he was the correctional officer who operated the video camera or that a correctional officer in addition to Burnside operated a video camera to capture the events on May 12, 2006.

[5] Picozzi misspelled Defendant Haldeman's name as "Haulderman" in her Complaint. (*See* Doc. 1 at 1, 2.)

Brief, at 6-13.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Eighth Amendment is the primary source for protection of an inmate who has been convicted and is serving his sentence and claims that officials used excessive and unjustified force. *See Whitley v. Albers,* 475 U.S. 312, 327 (1986); *Brooks v. Kyler,* 204 F.3d 102, 106 (3d Cir. 2000). When a plaintiff asserts an excessive force claim under the Eighth Amendment, "the central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Brooks,* 204 F.3d at 106 (quoting *Hudson v. McMillan,* 503 U.S. 1, 7 (1992)). To survive summary judgment, therefore, the evidence must "support a reliable inference of wantonness in the infliction of pain." *Whitley,* 475 U.S. at 322.[6] Although there is no minimum threshold regarding the extent of an injury required to establish excessive force[7], the prohibition of cruel and unusual punishment nonetheless "necessarily excludes from

---

[6]Such an inference of wantonness can be made, for example, when the evidence demonstrates that a guard intends to harm an inmate. *Brooks,* 204 F.3d at 106 (citing *Sampley v. Ruettgers,* 704 F.2d 491, 495 (10th Cir. 1983)).

[7]"[T]he absence of significant resulting injury is not a *per se* reason for dismissing a claim based upon alleged wanton and unnecessary use of force against a prisoner." *Brooks,* 204 F.3d at 109. The extent of the injury, however, does "provide[ ] a means of assessing the legitimacy and scope of the force" considering the attendant circumstances. *Id.*

12

constitutional recognition *de minimus* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10.

Courts consider many factors in determining whether an official used excessive force in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. These factors include:

> (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that as used'; (3) 'the extent of the injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'

*Brooks*, 204 F.3d at 106 (quoting *Whitley,* 475 U.S. at 321).

The undisputed factual record in this case establishes that, on May 12, 2006, Picozzi exhibited disruptive behavior, including by kicking her heels hard against her cell door, refusing to speak when asked about her behavior, and by presenting a note that stated that she was trying to bring attention to herself because she was being abused. It also is undisputed that psychiatric staff at the prison determined that Picozzi's behavior warranted a transfer to a POC, and that, while she was given many opportunities over a period of several hours to cooperate with this transfer, she continuously resisted. In short, Picozzi has failed to submit any evidence to contradict

13

the record, which establishes that, in light of her physical resistance to efforts to obtain her cooperation, force was utilized only as a last resort, and the amount used was both necessary and the minimum amount to accomplish the task of safely moving Picozzi to an area where she could obtain required medical treatment. As a result, Picozzi's excessive force claim against Corrections Defendants cannot survive summary judgment, and Corrections Defendants therefore are entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendants' unopposed Motion for Summary Judgment will be granted. An appropriate Order will enter on today's date.